## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 20 2019, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kevin Wild
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. Mackenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Eldridge Jerome Moore,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | September 20, 2019<br><br>Court of Appeals Case No.<br>19A-CR-680<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Barbara Cook Crawford, Judge<br><br>Trial Court Cause No.<br>49G01-1704-MR-13141 |

**Brown, Judge.**

[1] Eldridge Jerome Moore appeals his convictions for two counts of murder. He raises one issue which we revise and restate as whether the evidence is sufficient to support his convictions and negate his claim of self-defense. We affirm.

*Facts and Procedural History*

[2] On April 5, 2017, Moore lived with his uncle, Phillip McBrady, and Phillip's wife, Helen. Brandon Miller would visit their house in Indianapolis daily. Transcript Volume II at 30, 36. At some point that evening or the early morning hours of April 6, Miller had a drink or two and wanted to talk to Phillip about a "job that he was doin' for" a young man because Phillip had introduced them to each other. *Id.* at 38. Miller "just wanted to get a little more insight of . . . how the man worked as far as you know getting paid." *Id.* Miller's girlfriend, Tonya Peete, dropped him off near Phillip and Helen's house, stated that she would return to pick him up, and went to purchase gas for her vehicle. At some point, Moore shot Miller and Phillip.

[3] Meanwhile, Peete returned after "probably like about five minutes," parked in the driveway, and waited for Miller to come out. Transcript Volume II at 31. When he did not, she exited the vehicle, knocked on the door, and heard "a bunch of ruckus and glass breakin' and noises and people shufflin' and movin' around." *Id.* She began beating on the door, heard gun shots, and ran for cover.

[4] After retreating to her vehicle for "probably . . . about one, two minutes," she knocked on the door again and called for Phillip and Miller. *Id.* at 31. Moore eventually opened the door, and Peete saw Phillip and Miller's bodies on the

ground. Moore pushed her down on top of the bodies and her phone "went one way" and her keys "went the other." *Id.* at 32. He dashed into a room, she recovered her phone and keys and ran out the door and he ran out behind her. He "jumped in [Phillip's] truck and he pulled off fast." *Id.* at 33. She went back inside, called 911, and tried to resuscitate the lifeless bodies. Indianapolis Metropolitan Police Department ("IMPD") Officer Andrew Lamle responded to the scene and encountered Peete.

[5] Moore drove Phillip's truck and arrived at the house of his cousin, Kim McBrady, at "[a]round twelve thirty-one AM in the morning." *Id.* at 67. Moore told Kim that "he had messed up" and that, when he was at Phillip's house, somebody knocked at the door, "him and whomever was at the door had gotten into a fight," and "the guy was getting the best of him and he shot." *Id.* He told her that "the tire had came [sic] off the truck," he asked Kim to drop him off at 21st Street and Ritter Avenue, and they proceeded to that location. *Id.* at 68. She asked a couple of times that he call Phillip, and Moore indicated that "he's not answerin'." *Id.* at 70. When she asked him "well what do you think happened" and if he shot Phillip, Moore did not respond and "kind of jumped out of" the vehicle. *Id.* Kim turned around and drove to Phillip and Helen's house, and she encountered and was questioned by police officers on the scene.

[6] Moore arrived at 1718 Layman Avenue, and Erika Mack, who had been in bed, let him in and laid back down. There was "[n]ot very much" discussion between the two, and Moore laid down with Mack. *Id.* at 76. Later, a knocking at the

door awakened Mack, police officers announced themselves and ordered her to open the door, and she let them enter. IMPD Detective Justin McGaha ordered Moore to show his hands, he "just stood there and stared at" the officers, and he eventually stepped out with both hands in the air. *Id.* at 115. The officers ordered him to the ground, approached and handcuffed him, and found a small revolver handgun in his pocket. They transported and interviewed him at the homicide office.

[7] A walkthrough of the scene of the crime at Phillip and Helen's house revealed broken furniture, a hole in the drywall "like maybe somebody ran into" or "pushed into it," and a fired bullet. *Id.* at 95. An autopsy of Miller revealed five gunshot wounds, one of which entered the back side of his neck and had a wound path in a leftward and downward direction. He had tears and scrapes on his face and arms and had no significant injuries to his hands. An autopsy of Phillip revealed one gunshot wound, which entered on the left side of the chest and had a wound path directed slightly downward, a scraped bruising of the right upper cheek, a scrape of the side of the head, and a fracture of his orbital plate, or a "very thin park [sic] of the skull overlying the eye." *Id.* at 143.

[8] The State charged Moore with two counts of murder and later alleged that he was an habitual offender. At Moore's trial, the jury heard testimony from several witnesses, including Helen, Peete, Officer Lamle, Kim, Mack, Detective McGaha, IMPD Homicide Detective Leonard Nelson, Chief Forensic Pathologist Christopher Polous from the Marion County Coroner's Office,

IMPD Officer Gregory Wilkerson, a crime scene specialist, and a forensic scientist specialized in firearms identification.

[9]     During Peete's cross-examination, the following exchange occurred:

> Q  Okay.  Now [Miller] – you mentioned before that [Miller] can get a little agitated when he is drinking.  Correct?
>
> A  I don't recall telling you [Miller] get[s] agitated when he drinks.
>
> Q  Do you recall telling [a detective] that, you know, when he gets that kind of way, that you just hi try [sic] to walk it off?
>
> A  Well, I mean you know, that's with anybody but he doesn't always, like go on an outrage and go off and go crazy and do nothin' stupid or anything.
>
> Q  Okay.  And when you made a statement to [the detective] that night, you said [Miller] gets that way you figure let him walk it off, I'll come pick him up in a little bit.  Everything will be cool?
>
> A  Yeah.  Or even when we're together, he'll just go to sleep.  I mean but he doesn't get  to the point where I'm fearful from him or I think he's going to hurt me or do anything like [sic].

*Id.* at 40.  Kim testified she saw Phillip's truck when she stepped outside of her residence with Moore, that the tire "was off the rim," and that she could tell when she saw the truck that it was disabled in some fashion.  *Id.* at 68.  During cross-examination, when asked if she remembered the statement she gave detectives and whether Moore mentioned "that he had shot the guy off of him," she answered, "Yes," and indicated that Moore had "said the guy was getting the best of me."  *Id.* at 72.  The court allowed the prosecutor to conduct omitted direct examination, the prosecutor asked Kim if Moore complained of any pain

or if he showed her any injuries he had received, and she answered in the negative.

[10] Mack testified that she "didn't hear him say that" he did not mean to shoot his uncle but that she did hear him "tell the officers he couldn't get someone off of him." *Id.* at 78. During cross-examination, Mack testified Moore loved his uncle and that, "when she was around," he and Phillip "got along pretty good" and worked together. *Id.* at 80. On her omitted direct examination, Mack indicated that she did not notice any injuries on Moore, "but his face looked kid [sic] of red looking," and that he did not complain to her of any pain. *Id.*

[11] Detective McGaha answered in the negative when asked whether Moore made any complaints about experiencing pain in his presence and whether he had noticed any injuries on Moore. Officer Wilkerson testified that he stood beside Moore at the 1718 Layman address and heard him say only "My uncle, I didn't mean to kill him like that, but I couldn't [sic] him off of me." *Id.* at 120. During cross-examination, Chief Forensic Pathologist Polous indicated that Miller's blood alcohol content was .141.

[12] Detective Nelson testified about Moore's interview in the homicide office, and the court admitted without objection a DVD video recording of the interview and an audio transcription as State's Exhibit Nos. 56 and 57, respectively, published copies of State's Exhibit No. 57 to the jury, and played State's Exhibit No. 56. State's Exhibit No. 57 contains the following interview:

A: [Miller] knocked on the door. I go open the door and he come in talking all wild, talking about why this guy didn't pay him his money, this and that. Somebody else knocks on the door while he explained this to my uncle[, Phillip]. I'm sitting in the chair. My uncle was on the couch right by the door. So as soon as he start woo-woo-woo-woo about his money his girl, whoever she is, she knocks on the door. So he was about to open the door. So I said, "Hey, man, don't open that door. That's not your door to open[.]" You know what I'm saying? Don't, don't open the door. So he turned around and started going off. "F[---] you! I'll do. [sic] this is my grandpa's house!" And, uh; . . . he ain't really no kin to my uncle. You know what I'm saying?

* * * * *

Q: Okay. Uh; what . . . was [Miller] talking about, about money or how did that come about?

A: He, he, he, uh; cuz some, he worked for these guys and they didn't pay him and, and they wasn't paying him and this and that. So he wanted my uncle to drive him to go and try to get his money, this and that. And then my uncle wasn't doing none of that run himself up.

Q: Okay. Then what happened.

A: And, uh; he spoke, cussed me out. "F[---] you, m[-----f-----]!" [T]his and that.

Q: Uh-huh.

A: You ain't all that. And, you know, one thing led to another. You know what I'm saying? So I said, "You ain't all that!" You know?

Q: Okay I got to be more specific when you, and you have to be more specific . . . of the details when you say one thing led to another.

A: Oh, as far as, you know, he, uh; got all in my face, this and that. You know what I'm saying?

Q: Okay. So he was cussing you out in your face?

A: Yep, so, uh[] you know, I pushed him. He stole me. I stole him back. We got to fighting.[1]

Q: Okay.

A: So my uncle didn't get up and try to break it up. He just let us fight. So, you know. And he, [Miller is] younger than me. He's 29 or whatever. He, you know he, he was getting me. He had me on the ground on my knees. Had this coat right here over my head like, and it was, you know, swinging, you know.

Q: Uh-huh.

A: Uh; kind of, you know, fast and wild. So that's when my uncle got up and said, "Okay, that's enough! That's enough!" So he was pushing him away getting him up off of me.

Q: Now, your, your uncle, Phillip . . .

A: Phillip.

Q: . . . got in . . .

A: And got him off of me.

Q: Okay. So y'all were on the ground. [Miller] was on top of you?

A: Yeah. So, uh; that's when my uncle got him up off of me. I jumped up you know and, uh; and he bum rushed me again. Got away from my uncle and that's when he slammed me on, on I

---

[1] Later, during the statement, Moore clarified that "stole" meant: "Hit . . . He hit, you know." Exhibits Volume at 123.

don't know what he slammed me on, but I know my ribs right here is messed up, but he slammed me. He said, "Uh-huh! Uh-huh! You met your match now! You met your match now!" I said, "No, I ain't, I ain't met my match." So I had a pistol in my pocket. You know? So he had me on the couch. You know, so I reached in my pocket and then I shot him. Pow! You know, and he, [sic] "Oh, you shot me!" So he still, you know what I'm saying? He backed up and then he [sic] still bum rushing me. You know, so I shot him a couple of more [sic]. I shot a couple of more times.

Q: Uh-huh.

A: And then I said I don't know how my uncle got shot. I looked and he's laying on the floor. And I didn't understand that at all, why he got shot. I don't. 'Cause see [Miller] was in front of me.

Q: Uh-huh.

A: You know, unless my uncle was standing behind him or something. You know, I don't know. I don't know. I didn't mean to shoot my uncle. I did not mean to shoot my uncle at all: you know, I meant to did [sic] what I did to that man. You know what I'm saying? Or whatever. I admit that. You know what I'm saying? My actions was intentionally for him, but I didn't meant [sic] for my uncle to get what he got. You know what I'm saying? I didn't mean that [y]ou know, that's my mother's brother. I didn't mean that at all. So I got scared. And I, I left. I jumped in his truck and I left. You know, I should have just stayed there, but I left. (Inaudible)

Exhibits Volume at 118-120. Later questioning in the interview included the following:

Q: As far as you know, [Miller] didn't have a gun, though?

A: I didn't know what he had. I don't think he had one. I don't
know.

Q: I'm asking you what you . . .

A: No, he . . .

Q: . . . what you saw.

A: No.

Q: Did you see a gun?

A: No, I didn't see no gun.

Q: Okay. So, basically it would have start[ed] out with hands?

A: Yep.

*Id.* at 124-125.

[13] Detective Nelson testified that the interview occurred approximately twelve hours after the shooting and that he did not see any significant bruising on Moore

[14] In closing, Moore's defense counsel argued he acted in self-defense "plain and simple" and the jury must consider the situation from his perspective, highlighted Miller was drunk and not a peaceful person when he entered Phillip's house, and characterized Moore's push of Miller as "just a defensive, get out of my face." *Id.* at 196, 198. Before discussing Moore's video statement, his defense counsel stated: "Again we are not comparing two stories. Its [Moore's] story. He's in there. He knows what happened." *Id.* at 201.

After the jury retired to deliberate, the court granted its request to rewatch State's Exhibit No. 56, and republished copies of State's Exhibit No. 57. The jury found Moore guilty as charged. Moore admitted to the habitual offender enhancement by plea agreement, and the court sentenced him to concurrent terms of fifty-five years on the two counts of murder, with an additional six years added to the second count for the habitual offender enhancement, for an aggregate term of sixty-one years.

## *Discussion*

The issue is whether the evidence is sufficient to support Moore's convictions and negate his claim of self-defense. He asserts that the State failed to negate a single element of his self-defense claim. He points to his statement and Peete's testimony and argues that the "much younger and stronger" Miller was legally intoxicated and agitated, became hostile and aggressive, and instigated and continued to pursue a violent fight. Appellant's Brief at 15. He contends that Miller violently confronted him a second and third time following his and Phillip's attempts to deescalate the conflict, and that, unable to prevent further serious bodily injury, he shot Miller. He contends his statement to the police, as the only complete version of what occurred, was shown to be reliable, accurate, and corroborated, and that no evidence clearly contradicts anything in his statement or demonstrates that he willingly participated in the violence.

The State maintains that the evidence is sufficient to rebut Moore's claim of self-defense and sustain his convictions. It argues that Moore initiated the

altercation when he pushed Miller during a verbal argument, which began a fistfight between the two men, and that his statements to the police contain no mention of fear and show that he did not believe deadly force was necessary to prevent serious bodily injury. It points out that his withdrawal of a handgun from his pocket and the shooting of an unarmed Miller followed his retort of "No I ain't, I ain't met my match," and it argues that he shot Miller because he was angry. Appellee's Brief at 12.

[18] At the time of the offense, Ind. Code § 35-42-1-1(1) provided that a "person who . . . knowingly or intentionally kills another human being . . . commits murder, a felony." (Subsequently amended by Pub. L. No. 252-2017, § 10 (eff. Jul. 1, 2017); Pub. L. No. 144-2018, § 18 (eff. Jul. 1, 2018); Pub. L. No. 203-2018, § 1 (eff. Jul. 1, 2018); and Pub. L. No. 215-2018(ss), § 16 (eff. Jul. 1, 2018)). Under the doctrine of transferred intent, "if the evidence shows the requisite mental state to exist in conjunction with the performance of a criminal act, then the law may punish the perpetrator, although the particular person injured was a mere bystander." *Henderson v. State*, 343 N.E.2d 776, 778 (Ind. 1976). Stated differently, "when one person (A) acts (or omits to act) with intent to harm another person (B), but because of a bad aim he instead harms a third person (C) whom he did not intend to harm, the law considers him (as it ought) just as guilty as if he had actually harmed the intended victim." 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.4(d) (2d ed. 2003) (footnotes omitted). "Under the doctrine, a defendant's intent to kill one person is transferred when, by mistake or inadvertence, the defendant kills a third person; the defendant may

be found guilty of the murder of the person who was killed, even though the defendant intended to kill another." *Blanche v. State*, 690 N.E.2d 709, 712 (Ind. 1998) (citing *White v. State*, 638 N.E.2d 785, 786 (Ind. 1994).

[19]   Pursuant to Ind. Code § 35-41-3-2(c),

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force.  However, a person:
>
> > (1) is justified in using deadly force; and
> >
> > (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony.

(Subsequently amended by Pub. L. No. 107-2019, § 7 (eff. April 26, 2019)). Serious bodily injury means "bodily injury that creates a substantial risk of death or that causes . . . extreme pain . . . ." Ind. Code § 35-31.5-2-292.  A valid claim of self-defense is legal justification for an otherwise criminal act. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002).  In order to prevail on a self-defense claim, a defendant must demonstrate he was in a place he had a right to be; did not provoke, instigate, or participate willingly in the violence; and had a reasonable fear of death or great bodily harm.  *Id.*  The amount of force a person may use to protect himself or herself must be proportionate to the urgency of the situation.  *Harmon v. State*, 849 N.E.2d 726, 730-731 (Ind. Ct.

App. 2006). When a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished. *Id.* at 731.

[20] When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Wilson*, 770 N.E.2d at 800. If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id*. at 800-801. A mutual combatant, whether or not the initial aggressor, must declare an armistice before he or she may claim self-defense. *Id*. at 801; *see* Ind. Code § 35-41-3-2(g) (providing "a person is not justified in using force if . . . the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action") (subsequently amended by Pub. L. No. 107-2019, § 7 (eff. April 26, 2019)). The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson*, 770 N.E.2d at 801. We neither reweigh the evidence nor judge the credibility of witnesses. *Id*. If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id*.

[21] The record reveals that Miller suffered five gunshot wounds, one of which entered the back side of his neck and had a leftward and downward direction. The jury watched a video recording of Moore's statement to the police, which it

asked to re-watch during its deliberation. In it, Moore indicated Miller "got all in [his] face, this and that," answered affirmatively when asked, "[s]o he was cussing you out in your face," and then expounded "so uh[] you know, I pushed him." Exhibits Volume at 119. He stated:

> He said, "Uh-huh! Uh-huh! You met your match now! You met your match now!" I said, "No, I ain't, I ain't met my match." So I had a pistol in my pocket. You know? So he had me on the couch. You know, so I reached in my pocket and then I shot him. Pow!

*Id.* He admitted that he did not see Miller with a gun and offered that, although he did not mean to shoot his uncle, he had "meant to d[o] what [he] did to that man" and his "actions w[ere] intentional[] for" Miller. *Id.* at 120. Although Moore argues that the conflict with Miller was violent, Mack did not notice any injuries on Moore, Detective McGaha indicated that Moore did not complain about experiencing any pain and that he did not notice any injuries on him, and Detective Nelson testified that he did not see any significant bruising on him. The jury as the trier of fact was able to assess Moore's demeanor and credibility and, based upon all of the evidence before it, could determine that he provoked or instigated the violence, that he did not withdraw from the encounter, that he did not have a reasonable fear of great bodily harm, or that the amount of force he used was unreasonable under the circumstances.

[22] We conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have determined beyond a reasonable doubt that Moore did not validly act in self-defense and that he was guilty of the

charged offenses. *See Bryant v. State*, 498 N.E.2d 397, 398 (Ind. 1986) (holding that the defendant's "position amounts to no more than an invitation for us to reweigh the evidence" and noting that the State's evidence was sufficient to negate self-defense).

[23] For the foregoing reasons, we affirm Moore's convictions.

[24] Affirmed.

Altice, J., and Tavitas, J., concur.